### WESTWOOD v. CRISSEY et al.

(Supreme Court, Appellate Division, Fourth Department. July 12, 1910.)

PARTNERSHIP (§ 86*)—ACCOUNTING—RIGHT TO.

Plaintiff having formulated an enterprise to be conducted under a partnership agreement, whereby one of his associates with the other's knowledge undertook to indorse plaintiff's notes to enable him to furnish his share of the advances necessary to be made by the firm, is entitled to a fair proportion of the profits, though his associates purported to expel him from the firm for nonpayment of his share of such advances; the promise to indorse his notes being broken.

[Ed. Note.—For other cases, see Partnership, Dec. Dig. § 86.*]

McLennan, P. J., and Robson, J., dissenting.

Appeal from Trial Term, Chautauqua County.

Action by Herman J. Westwood against Harlow J. Crissey and another. From a judgment dismissing the complaint (66 Misc. Rep.

53, 120 N. Y. Supp. 884), plaintiff appeals. Reversed, and new trial ordered.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, KRUSE, and ROBSON, JJ.

Herman J. Westwood, for appellant.

A. C. Wade, for respondent Crissey.

SPRING, J. The appeal in this case brings up for review the findings of fact and conclusions of law contained in the decision of the court below and also in the requests to find made by the plaintiff. These requests to find facts are very voluminous, and every one of them was found by the court. The evidence is not contained in the record, but it seems to me upon the findings made by the court below that the judgment should be reversed.

In the early part of the year 1907, the plaintiff in a litigation in which he was employed discovered a machine, called the "Tracey hand machine," which was designed for filling paper packets with seeds. The United States government, through its Agricultural Department, had been in the habit of letting a contract to the lowest bidder to fill these packets or bags with seeds and sew them up and dispose of them as directed by Members of Congress, the Secretary of Agriculture, and various other officials of the United States government. The contract was one of considerable importance, as about 40,000,000 bags of these seeds were filled and distributed each year.

The plaintiff, with a view of entering into the competition for bids, enlisted with him a man of property named Cole, residing in Dunkirk. The plaintiff, with the assent of Cole, went to Washington, made an investigation of the whole subject, and after he returned they concluded to apply for the contract, going into the venture equally. By their agreement or understanding Cole was to have charge of the filling and distribution of the packets, which had to be done in a building furnished by the government at Washington.

The defendant Crissey was a banker and president of the Citizens' Trust Company in the village of Fredonia, where the plaintiff resided. It became necessary to send a certified check to the government of $1,000 to accompany the bid which was to be made for the government contract. The plaintiff was insolvent, as both the defendants knew, and he applied at the trust company to obtain this money on the 10th day of April, 1907, and the defendant Crissey asked to be admitted to the copartnership and receive a 10 per cent. interest therein. On the same day the defendant Cole, at the request of the plaintiff, agreed that Crissey should become a member of the copartnership on the basis already mentioned. The court has found:

"That during the conversation between the parties hereto at the bank of the defendant Crissey on the morning of April 10, 1907, the defendant Crissey agreed that if he were admitted into a 10 per cent. share in the partnership he would give the plaintiff the financial assistance the plaintiff required to supply his share of the capital necessary for the carrying out and fulfilling the government contract, and would indorse the plaintiff's notes therefor."

On the same day, and in pursuance of said arrangement, the parties entered into the following agreement:

"This memorandum made April 10, 1907, is to witness that the undersigned have this day entered into a partnership to put up the 1907–1908 congressional seed distribution contract, if they are awarded the bid; they are to supply of the necessary capital and share in the net profits, and to contribute of any losses in the following proportions among themselves, viz.: Cole 45 per cent., Westwood 45 per cent., and Crissey 10 per cent. The firm name to be Cole & Westwood. Details of the getting of the contract and of the work under the contract to be as talked and arranged mutually hereafter.

"E. A. Cole.
"H. J. Westwood.
"H. J. Crissey."

The court further finds:

"That thereupon it was mutually agreed between the parties that the defendant Cole should have the exclusive and active charge at Washington of the work of fulfilling the government contract if it was awarded to the parties; that the defendant Crissey should obtain the $10,000 bond required by the Department of Agriculture to accompany the contract, which bond was to be conditioned that the same should be null and void if the said Cole & Westwood should faithfully perform all the requirements of the said contract; and that the said plaintiff should perform any legal services incident to the business of the partnership."

It is apparent, therefore, from these findings, that Crissey, with the knowledge of the defendant Cole, was received into the copartnership and entered into the agreement with the explicit understanding that the plaintiff would not be able to supply his part of the money needed to carry on the business in case they obtained the contract with the government, and that Crissey, who was a man of means and abundantly able to furnish the necessary money, was expected to do so.

In providing the $1,000 necessary for the purpose of sending the certified check to the government, each copartner contributed his aliquot share. The plaintiff's share of $450 was obtained at the Citizens' Trust Company and upon the indorsement of Crissey made in pursuance of the agreement to supply the funds already referred to. The United States Agricultural Department early in April advised Cole & Westwood that their bid for the seed contract was the lowest one received, and requested a personal interview at the Department before awarding any contract. Accordingly, the plaintiff with Mr. Cole went to Washington, made the necessary arrangements, looked up some additional machinery that was necessary, and finally their bid was accepted, and the contract, bearing date the 1st day of May, 1907, was entered into between the parties to this action individually and the government, and the necessary bond executed by the parties with sureties, which was soon thereafter presented to the government and accepted by it. The plaintiff thereupon obtained one of the Tracey hand machines, which was the pattern for the bag-filling machines used in the consummation of the contract, and the parties immediately commenced operations to enable them to fill the packets and distribute them as provided in said agreement.

In the early part of June it became apparent that it was necessary to raise money for the purpose of carrying out this agreement, and the court finds:

"That on June 11, 1907, the plaintiff orally requested the defendant Crissey to indorse his note for the plaintiff's share of such part of the capital of the partnership as was then needed; but the defendant Crissey refused to do so."

On the 13th of June the plaintiff wrote to Mr. Crissey that it was advisable to raise $500 and place in the bank for the use of the company and inclosed his promissory note for $225, his portion thereof, and requested Crissey to indorse the same, which he refused to do. Two days later Cole and Crissey wrote a letter to the plaintiff that it was necessary to pay in the sum of $3,000 at once, and that his share must be paid on or before the 18th of that month. The letter concluded as follows:

"Please take further notice that in the event of your failure to contribute your proportionate share of said sum of three thousand ($3,000.00) dollars within the time above designated, that we shall consider the copartnership created and existing of Cole & Westwood dissolved, and that we shall take steps to acquire the capital necessary for the performance of said contract with the government from other sources and elsewhere, and shall proceed in the performance of said contract without any reference to you or any interest that you shall claim to have thereunder because of your failure to perform as hereby required and as the necessities demand, and shall refuse at any time hereafter to pay you any portion of any moneys or profits whatever resulting from and which we shall receive from or on account of said contract between said copartnership and the United States government."

The plaintiff replied to this letter very elaborately under date of June 18, 1907, and denied emphatically the right of the defendants to dissolve the partnership or to expel him therefrom.

During all this time the plaintiff had been vigilant and effective in organizing the work with a view to carrying out the contract. He was more familiar than his copartners in the general scope of the labor involved in the fulfillment of the contract, knew of the methods to be adopted, the machinery and appliances required, and was in very frequent consultation with Cole pertaining to the business, especially up until about the middle of July. The defendant Crissey was not active at this time in the practical part of the business of the company. It had been agreed at the outset that Cole was to have charge of the work in Washington, and he consequently was acquainting himself with the details of it for the purpose of making the venture a success, and his knowledge of the business was chiefly gained from the plaintiff. When the actual performance of the contract was commenced, Cole went to Washington, assumed the active charge of the business under a salary, and continued there until the contract was completed.

During the month of September Cole and Crissey made further requests upon the plaintiff to contribute his part, and again threatened to dissolve the corporation or expel him from it in case this was not done; and as late as October 8, 1907, the defendant Crissey wrote to the plaintiff to contribute to the funds of the copartnership, and concluded his letter with the statement:

"That we shall consider the copartnership created and existing of Cole & Westwood dissolved, and that we shall take steps to acquire the capital necessary for the performance of said contract with the government from other

sources and elsewhere, and shall proceed in the performance of said contract without any reference to you or any interest that you shall claim to have thereunder because of your failure to perform as hereby required and as the necessities demand, and shall refuse at any time hereafter to pay you any portion of any moneys or profits whatever resulting from and which we shall receive from or on account of said contract between said copartnership and the United States government."

Considerable property had been purchased by the defendants on behalf of the firm, and they had insured this in their own names, and in November, 1907, it was destroyed by fire, and $9,200 in insurance money was paid to them, which was reinvested in the business. Including this $9,200, the defendants contributed over $18,000 in carrying out the contract, and the profits of the enterprise, including the insurance money, were nearly $11,000, which was divided equally between the two defendants according to an agreement among themselves.

During all the time after the defendant Crissey had absolutely refused to comply with his promise to indorse the notes of the plaintiff so that he might furnish his part of the money demanded in the prosecution of the firm's business, the plaintiff unavailingly made vigorous efforts to obtain the money required to meet the calls made upon him. The court has found as a fact that he acted in good faith. During the period that the contract was being carried on, he was ready to perform any work which he was called upon to do. He paid out for expenses $110.35 and is credited therefor upon the books of the company.

It may be that a member of a firm who absolutely refuses to contribute his part of the necessary capital to carry on the firm business excludes himself from the firm and from any right to participate in its profits, if any there be. I think that rule does not apply to this case.

The plaintiff was not repudiating the copartnership agreement. He expected that Crissey would aid him in obtaining the money required for his proportion. Cole was present when that agreement was made. He knew that the plaintiff was unable to furnish the money which he would be called upon to pay, and the agreement was entered into with all parties understanding the precise situation. It was not until the defendant Crissey had agreed to be the paymaster for the plaintiff that the copartnership agreement was entered into. The plaintiff always recognized the binding force of that agreement and never attempted to escape payment of the obligations it imposed. His failure was due, not to repudiation of the agreement, but to his inability to procure the money after repeated efforts to do so. If Crissey had complied with the agreement which he made with the plaintiff and which was entered into with the knowledge and assent of Cole, all would have been well. The one who formed the plan and was responsible for the contract with the government was pushed aside by the defendants in order that Crissey might reap the benefits accruing from the performance of that contract.

I think the defendants, in view of these circumstances, could not at the very outset of the agreement, when it became necessary to raise

money, expel the plaintiff from any rights in the copartnership contract. Apparently they themselves did not think that the letter of June 13th was sufficient to obtain his expulsion, for this was followed up by repeated interviews and other letters as late as October 8th, each containing the same suggestion that they would "consider" him outside of the firm in case he did not contribute.

It may be that the plaintiff is not entitled to the full 45 per cent., which was his proportionate share by the terms of the agreement. He was the originator of the project. He ascertained the method by which seeds were distributed by the government. He discovered the kind of machine that was necessary to be used. He obtained the machine. It was used as a model, and in the inception of the plan he is entitled to the credit of it. The action is in equity, and I think his rights should be ascertained, and that he is entitled to be paid his fair and just proportion of the profits that were made.

The judgment should be reversed.

Judgment reversed, and new trial granted, with costs to appellant to abide the event. All concur, except McLENNAN, P. J., and ROBSON, J., who dissent on opinion of Marcus, J., delivered at Trial Term.